# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | | |
|---|---|---|---|
| **JASON C. UNDERWOOD,** | ) | | |
| | ) | | |
| **Petitioner,** | ) | | |
| | ) | | |
| **v.** | ) | **No.:** | **1:15-CV-331-HSM-SKL** |
| | ) | | |
| **CHERRY LINDAMOOD,** | ) | | |
| | ) | | |
| **Respondent.** | ) | | |

## MEMORANDUM OPINION AND ORDER

Petitioner Jason C. Underwood, a Tennessee inmate proceeding pro se, has filed a federal habeas petition pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his confinement under his 2006 Bedford County Circuit Court judgments of conviction for theft and two counts of first-degree premeditated murder, and his resulting life sentences without parole. Having considered the submissions of the parties, the State-court record, and the law applicable to Underwood's claims, the Court finds that the petition should be denied.

## I.
## SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

The bodies of Anthony Baltimore ("Baltimore") and his live-in girlfriend, Rebecca Ray ("Ray"), were discovered in the morning hours of Monday, October 25, 2004, inside of their residence on Simms Road in Shelbyville, Tennessee, by Baltimore's father, Anthony Wayne Baltimore ("Baltimore Senior") and his sister, Hope Shafer [Doc. 30-11 p. 40-45, 67-70]. The bodies of both victims bore multiple stab wounds, and blood was found throughout the residence [*See, e.g., id.* at 100-101].

At Underwood's trial, Baltimore Senior testified that he had purchased a 1993 GMC pickup for $3,000 for his son a few months before he was killed [Doc. 30-11 at 58]. Baltimore Senior

stated he had last seen his son and Ray alive the Saturday evening prior to their deaths [*Id*. at 62]. He claimed that he drove by his son's home the following day (Sunday) but did not see Baltimore's truck, so he assumed that he was not home [*Id*. at 66].

Hope Shafer testified that on Monday, October 25, 2004, she and Baltimore Senior went to Baltimore's residence on Simms Road, where she noticed the back door slightly open and Baltimore's truck missing [*Id*. at 40-43]. At approximately 8:16 a.m., Shafer pushed the back door open and screamed when she saw her brother's body lying on the floor [*Id*. at 43-44]. Upon hearing Shafer's distress, Baltimore Senior entered the residence, touched Baltimore's body, and told Shafer that it was cold [*Id*. at 45]. Shafer and Baltimore Senior drove to a store to call 911, and then Baltimore Senior returned to the house on Simms Road, while Shafer remained at the store [*Id*. at 46-47].

Detective Sergeant Jason Williams of the Criminal Investigations Division ("CID") testified that he and Lieutenant Pat Mathis were dispatched to the crime scene and performed a "visual scan" of the area when they arrived, noticing no sign of forced entry to the door and the presence of blood "just everywhere" [*Id*. at 96-100]. The victims' bodies were found in transition areas to the den [*Id*. at 100-101]. Baltimore was wearing only blue jeans and socks [*Id*. at 100]. Ray was wearing only a t-shirt [*Id*. at 101]. Williams noticed several shoe prints in dried blood that appeared to be from the same shoe sole [*Id*. at 102-03]. During this scan, Williams also noticed an aerosol can in a bedroom that appeared to have blood on it [*Id*. at 116-17]. After conducting this initial sweep, the officers requested assistance from the Tennessee Bureau of Investigation ("TBI") [*Id*. at 118].

An investigation unit with the TBI arrived at approximately 12:07 p.m. and began collecting evidence [*Id*. at 120-21]. TBI Special Agent Forensic Scientist Steve Scott noticed a

hair and a bloody fingerprint on the interior doorknob of the back door [Doc. 30-12 p. 95-96].

Agents also observed a finger or handprint in blood on Ray's leg [*Id*. at 110]. TBI collected,

among other items, the bloody doorknob and a condom lying close to Ray's body [*Id*. at 95-96,

100].

On the morning the victims' bodies were found, a towing company was contacted to

remove an abandoned vehicle from the parking lot of Corsicana Bedding, a Shelbyville business

[*Id*. at 12-13]. When the tow-truck driver arrived, he saw a gold-colored pickup that appeared to

have bloodstains in its interior [*Id*. at 13, 16]. Having heard a "Be on the Lookout" ("BOLO") for

a similar vehicle earlier in the day, the tow-truck driver called the police department and reported

his discovery [*Id*. at 16-18]. Lieutenant Mathis, Detective Lori Mallard, and Major Jan Phillips

left the crime scene at Simms Road to examine the pickup truck [Doc. 30-11 p. 121]. After arriving

at Corsicana Bedding, Lieutenant Mathis observed blood stains on the interior and exterior of the

truck, as well as on the gravel just outside of the driver's door on the truck [Doc. 30-12 p. 35-36].

After the vehicle was photographed, Mathis arranged for the pickup to be towed to a secure

location where the TBI would process it the following day [*Id*. at 36-44, 112-13]. Mathis also

collected some of the bloodstained gravel, which was submitted for DNA analysis [*Id*. at 51].

During the investigation of the case, a truck driver told officers that he saw someone park

the stolen pickup at Corsicana Bedding at around 8:00 a.m. and then flee the vehicle [Doc. 30-15

p. 82-83]. After learning of this information, Officer Mathis contacted Ranger Shane Petty, an

employee of the Tennessee State Park Service who handled bloodhounds proficient in human

trafficking [Doc. 30-12 p. 44-45; Doc. 30-14 p. 60-61]. Petty arrived with his bloodhound on

October 26, 2004, and Mathis gave Petty the floormat of the pickup, which the bloodhound used

to "get a scent" [Doc. 30-12 p. 44-45; Doc. 30-14 p. 67]. The pair went to Corsicana Bedding,

where the bloodhound alerted and tracked the scent through a creek bed to the back of a neighborhood approximately 100 yards from a house that was later identified as the residence of Underwood's grandmother [Doc. 30-12 p. 45-46; Doc. 30-14 p. 70-74]. Underwood lived in a house across the street [Doc. 30-12 p. 48]. The distance from where the truck was abandoned to Underwood's residence was approximately three-tenths of a mile [*Id*. at 52].

No suspects were identified from the initial investigation of the crime scene [Doc. 30-11 at 126]. As persons were interviewed, Detective Williams learned that the victims were both involved in drugs, and that they had "stiffed" people in drug transactions [*Id*. at 140-143]. At trial, Hope Shafer admitted that she knew Baltimore and Ray used marijuana, and she stated that while she had heard Baltimore had used cocaine, she did not know that to be a fact [*Id*. at 50]. Shafer also stated that Baltimore worked for a roofing company and was physically strong, while Ray would often "get physical" with both men and women and "didn't back down from anybody [*Id*. at 51-52].

During his investigation, Lieutenant Mathis learned that the victims might have purchased drugs from an individual named "OD" and/or a man named Greg Marlin [Doc. 30-12 at 61-62]. OD's house was also three-tenths of a mile from the location where Baltimore's truck was abandoned [*Id*. at 63-64]. Mathis also learned that three beer cans found in the Simms Road residence had DNA that matched that of a man named Charles Oldfield [*Id*. at 67]. Mathis interviewed Oldfield, who stated that he had been drinking beer and "smoking dope" with the victims on the Thursday or Friday before the murders [*Id*.]. Mathis testified that an individual named Brent Sadler was at the residence with Oldfield at the time, and that Sadler was also interviewed [*Id*. at 67]. After these interviews, Mathis concluded that other witnesses had seen the

victims alive after the night that Oldfield and Sadler visited the Simms Road residence [*Id.* at 67-68].

Officer Wilkerson testified that, after the murders, he conducted door-to-door interviews near the area where Baltimore's pickup was located [Doc. 30-14 at 34]. As part of this canvassing, he visited Underwood's home on November 1, 2004, and asked to see Underwood's hands, noticing a "knick" on one of Underwood's index fingers [*Id.* at 36-41, 50]. Wilkerson stated that Underwood stated he had no knowledge of the murders, and that while Underwood acted nervous during the conversation, it did not raise any suspicion, because everyone Wilkerson spoke to that day seemed alarmed [*Id.* at 36-41].

Law enforcement got a break in the case on November 10, 2004, when Darrin Shockey, a forensic scientist for the TBI specializing in latent print examination, notified the Shelbyville Police Department that the fingerprint from the doorknob matched Underwood's [Doc. 30-13 p. 180-81]. Once investigators learned of the match, they obtained three warrants for Underwood: two for first-degree murder and one for theft [Doc. 30-14 p. 110]. Officer Wilkerson and Detective Mathis attempted to execute the warrants on November 10, 2004, but when Underwood saw Detective Mathis with handcuffs, he fled, literally running out of his shoes and leaving them behind to be collected by officers [Doc. 30-14 p. 92-98; *see also* Doc. 30-12 p. 48-50]. Underwood was pursued to Bedford Manor Apartments and was eventually found hiding in a residence, where he surrendered and was taken into custody [Doc. 30-14 p. 98-101]. Following Underwood's arrest, his palm print was taken for analysis and submitted to the TBI [Doc. 30-12 p. 56].

Darrin Shockey testified that he also matched three fingerprints from a coffee mug found on the living room table at the crime scene to Underwood [Doc. 30-13 p. 176-77]. He stated that he used detailed photos of a hand print preserved in blood on Ray's left calf and compared it with

Underwood's latent palm print, concluding that Underwood's palm "100 percent, without a doubt" had touched Ray's calf [Doc. 30-13 p. 183; Doc. 30-14 p. 29]. Shockey conceded that this investigation was the first time he had been able to analyze latent fingerprints preserved in blood from a human body [Doc. 30-14 p. 12]. Shockey stated he was unable to match the latent prints on the abandoned pickup to either the victims or Underwood [Doc. 30-13 p. 170].

Medical examiner, Dr. Amy R. McMaster, performed the autopsies of the victims [Doc. 30-15 p. 90, 95]. Baltimore suffered 41 stab and incised wounds to his body, the deepest of which was a five-inch stab wound to his back [*Id*. at 101-02]. Dr. McMaster testified that none of Baltimore's injuries would have immediately incapacitated him, and that it would have taken "a few minutes" for Baltimore to die from the blood loss [*Id*. at 108]. She testified that Baltimore did not appear to have any defensive wounds [*Id*. at 109]. Dr. McMaster stated that the wounds inflicted exceeded those necessary to cause Baltimore's death, and that he would have had some period of suffering before he lost consciousness from blood loss [*Id*. at 113-14]. She also stated that Baltimore had two substances in his blood that were cocaine metabolites, indicating he had used cocaine recently before his death [*Id*. at 111-12].

Dr. McMaster stated that Ray had suffered 59 stab and incised wounds to her head, neck, torso, and extremities, along with multiple superficial wounds, contusions, and abrasions [*Id*. at 117]. She testified that one of Ray's stab wounds entered her ear canal, and the deepest wound was an approximate four-inch wound to her chest/abdomen region [*Id*. at 119]. Dr. McMaster stated that none of Ray's injuries would have immediately incapacitated her, and her body bore defensive wounds, suggesting that she was conscious and suffered prior to her death [*Id*. at 129-130]. Dr. McMaster opined the wounds inflicted to Ray were more than those necessary to cause her death [*Id*. at 131]. Toxicology performed on Ray showed that she had ingested cocaine within

an hour of her death, and it also demonstrated the presence of marijuana and cocaine metabolites [*Id*. at 127]. Dr. McMaster also performed a rape kit on Ray's body and turned it over to the TBI for analysis [*Id*. at 125-26].

Testing of the rape-kit samples revealed the victims' DNA on oral, vaginal, and anal swabs, while there was a third contributor's DNA in the anal swab [Doc. 30-13 p. 92-93]. Underwood could not be excluded as a contributor of the DNA recovered from the anal swab [*Id*. at 93-94, 101-02]. Testing of the condom recovered from the scene did not reveal the presence of any spermatozoa or semen [*Id*. at 91]. Blood samples from Baltimore's pickup were also tested, and the blood DNA profile from inside the driver's side door matched Underwood [*Id*. at 96]. The victims' blood was found on the floor mat and on the stained gravel that was recovered from the location of the pickup [*Id*. at 97-98]. No knives found at the crime scene were tested for DNA [*Id*. at 120-21]. The murder weapon was never identified [Doc. 30-15 p. 62-63].

Following his arrest, Underwood was taken to the police station and placed in an interview room, where Detective Williams and Detective Brian Crews of the Shelbyville Police Department interviewed him at approximately 11:20 a.m. on November 10, 2004 [Doc. 30-14 p. 116-17]. Williams testified that the officers identified themselves, stated the purpose of the interview, and informed Underwood of his *Miranda* rights[1] [*Id*. at 117-119]. Williams testified that Underwood appeared to understand his rights and did not appear to be under the influence of any intoxicant [*Id*. at 119-20]. Underwood agreed to speak with the officers, and the interview was video recorded and audio recorded [*Id*. at 121].[2] Williams testified that Underwood requested another

---

[1] These are the well-known warnings, such as the right to remain silent, that must accompany a custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[2] No transcript from the November 10, 2004, is in the record provided to the Court.

meeting where he gave another videotaped statement on February 25, 2005, in the presence of Williams, Underwood's defense attorney, and Assistant District Attorney ("ADA") Mike Randles [*Id*. at 127-28].[3]

Underwood's November 10 interview was introduced into evidence at trial, in which Underwood initially denied being at the victims' house and stated he did not know them well.[4] *Underwood I*, 2008 WL 5169573, at *10. After he was confronted with the fact that his fingerprint was found on the doorknob, Underwood admitted that he had been dropped off at the residence by a friend named Kevin and saw the victims laying badly wounded on the floor. *Id*. Underwood gave a third version of events in the same interview, in which he stated that he was using drugs with the victims when the victims attacked him — Baltimore with a Crown Royal bottle and Ray with a pipe — and that he stabbed them each a couple of times in the ensuing fight. *Id.*

Sergeant Williams stated that at the time of the November 10 interview, Underwood had an injury behind his ear, on the knuckle of his right index finger, and another on the joint near his thumb [Doc. 30-15 p. 40-43]. Underwood stated that he received the scratch on his thumb joint while fleeing from police while attempting to evade arrest [*Id*. at 41]. Williams stated that Underwood had a scratch above his left elbow that Underwood believed was from the altercation at Simms Road [*Id*. at 43]. On cross-examination, Williams acknowledged that some of Underwood's statements were untruthful, as, for example, there was no Crown Royal bottle or pipe found at the crime scene with which he could have been attacked [*Id*. at 55]. Williams also stated Underwood purported to be wearing the same shoes and pants at the interview that he was

---

[3] No transcript from the February 25, 2005, interview is in the record provided to the Court.

[4] While the facts in this paragraph are taken from the State court's opinion, the Court notes that these facts are repeated by the State in closing argument, which is in the record [Doc. 30-16 p. 40-65].

wearing the night of the murders, but Williams acknowledged that the pants and shoes had later tested negative for blood [Doc. 30-15 at 62; *see also* Doc. 30-13 p. 121-22].

Underwood did not testify at trial [*See, e.g.*, Doc. 30-15 p. 151-54]. In Underwood's defense, his optometrist testified that he had 20/150 vision, meaning "what you can stand back and see at 150 feet, he would need to be 20 feet to see the same size" [Doc. 30-15 p. 164-65]. Underwood's second cousin, Terrance Lee Scott Smith, testified that he saw both victims on October 23, 2004, at the residence of Underwood's grandmother, and that he met Baltimore's truck on the road at around 1:45 a.m. as he was returning to the residence [Doc. 30-16 p. 15-17]. When he returned, Smith testified, neither Underwood nor the victims were at the residence [*Id.* at 17]. Brandy Nicole Clark, who resided in the Bedford Manor Apartments building where Underwood was ultimately arrested, testified that she voluntarily let him in her apartment on the day of his arrest [*Id.* at 20-21]. Lisa John Hillis, who lived next door to the victims' residence, testified that around 2:45 a.m. on Sunday, October 24, 2004, she heard what sounded like a four-wheeler coming through her backyard [*Id.* at 22-23]. She testified that at approximately 3:00 a.m., it "fired back up and raced off" [*Id.* at 24]. She stated that it had happened every night since she moved next door to the victims' residence in June 2004 [*Id.*]. After October 24, 2004, however, she never heard it again [*Id.*]. She also stated that around dinnertime on October 24, 2004, she saw a beaten-up "deep wine colored" Dodge Caravan pull up to the victims' home and saw a white male with medium build and "blondish-brownish" hair beating on the front door [*Id.* at 25-26]. Hillis stated the man returned to the van and left when no one answered the door [*Id.*]. She saw the same van seven or eight times the next day while law enforcement was working at the scene [*Id.* at 26].

Following a five-day jury trial, the jury found Underwood guilty of all counts and unanimously sentenced him to imprisonment for life without the possibility of parole on both

counts of first-degree murder [Doc. 30-16 p. 120-21, 160-62].[5]   The trial court ordered the

sentences to run consecutively [Doc. 30-17 p. 22].

After his motion for a new trial was denied, Underwood appealed his convictions and

sentences [*Id*. at 52-55].   On December 10, 2008, the Tennessee Court of Criminal Appeals

affirmed.   *State v. Underwood*, No, M2006-01826-CCA-R3-CD, 2008 WL 5169573, at *1 (Tenn.

Crim. App. Dec. 10, 2008) ("*Underwood I*").   Underwood did not seek permission to appeal that

decision.

Underwood then filed a pro se petition for State habeas relief that was dismissed on July

30, 2008 [*See* Doc. 30-24 p. 35-36].   On December 9, 2009, Underwood filed a pro se petition for

post-conviction relief in State court [Doc. 30-25 p. 4-19].   Counsel was appointed to assist

Underwood on December 21, 2009, and privately retained counsel Russell Leonard was thereafter

substituted on May 17, 2010 [*Id*. at 22, 28, 35].   Newly-retained counsel filed a writ of error *coram*

*nobis* on July 23, 2010, and an amended petition for post-conviction relief on July 26, 2010 [*Id*. at

51-75].   An evidentiary hearing was held on the motions, along with a motion for DNA analysis,

on September 24, 2010 and November 15, 2010 [*See, e.g., id*. at 91].

At the evidentiary hearing, Underwood's initial counsel, Fannie Harris, testified that she

was a criminal defense attorney whose firm was briefly retained to represent Underwood, and that

she met with her client, police officers, and the ADA on February 25, 2005, where Underwood

gave a statement to officers [Doc. 30-26 p. 6].   She stated that she did not invoke the protections

---

[5] The State sought the enhanced punishment of imprisonment for life without the possibility
of parole, citing that the murder was "especially heinous, atrocious or cruel in that it involved
torture or serious physical abuse beyond that necessary to produce death" [Doc. 30-1 p. 112].

of Rule 11[6] prior to that meeting, which would have protected the statements as confidential statements made during plea negotiations, and that she did not ask that Underwood receive immunity or protections from any statement he gave [*Id*. at 7]. Harris eventually withdrew as counsel after Underwood's mother filed a complaint against her with the Board of Professional Responsibility ("BPR") [*Id*. at 8]. Harris acknowledged that the BPR had censured her after she incorrectly responded to the complaint that she had not allowed Underwood to give an interview with the ADA on February 25, 2009, but she maintained that she had never seen the tape of the interview and believed at the time she responded to the complaint that the interview had not occurred [*Id*. at 9-10]. Harris testified that she received the State's discovery at the conclusion of the interview, conceding that she had not seen it prior to setting up the meeting [*Id*. at 17, 22]. Harris stated that she gave all discovery in the case to her investigator, who had never returned it but who had proven "diligent" in working with other attorneys in the law firm [*Id*. at 9-10].

Harris testified that she had known Underwood prior to this crime, and that she agreed to set up a meeting with Underwood, the police, and the ADA, where Underwood could tell the truth about what had happened the night of the murders [*Id*. at 17, 23]. She stated that she believed Underwood's steadfast declaration of innocence that he had only confessed out of fear, and that he wanted to tell the police who committed the murders [*Id*. at 18-19]. While testifying, Harris recalled that she did attempt to request Rule 11 protections prior to the meeting, but that the ADA refused to offer any protections [*Id*. at 19]. Harris stated that, eventually, an understanding was reached that Underwood would tell the truth, the ADA would investigate it and see if he could corroborate it, and perhaps the information would help Underwood when they reached the stage

---

[6] The Tennessee Rules of Evidence provide that statements made by a party in the course of proceedings under Rule 11 of the Tennessee Rules of Criminal Procedure are generally not admissible against that party. *See* Tenn. R. Evid. 410.

of plea negotiations [*Id.* at 20-22]. Harris testified that she would not have set up the meeting if she had thought that Underwood was going to make incriminating statements [*Id.* at 27-28].

Pre-trial counsel, Hershell Koger, represented Underwood after Harris withdrew. [*See id.* at 50]. Koger testified that he remembered watching the February 25, 2005, video of Underwood's meeting and seeing the State hand over the initial discovery at the end of the meeting [*Id.* at 61]. He filed a motion to suppress Underwood's statement from the interview, recalling that one of the bases was ineffective assistance of counsel, as Harris had scheduled the interview before receiving discovery from the District Attorney's office [*Id.* at 62]. He stated it was "almost always a bad idea" to let a defendant talk to the District Attorney [*Id.* at 63]. Koger stated that there was some "clever defense thinking" on the part of trial counsel for deciding not to pursue the motion to suppress the February 25 statement, although he could not recall what the strategy was [*Id.* at 70-71].

Trial counsel, Robert Marlow, testified that he did not pursue the motion to suppress the February 25 statement because it would have raised an issue of ineffective assistance of counsel, which is generally improper to raise during trial or on direct appeal [*Id.* at 109-10]. Marlow stated that during the February 25 interview, Underwood claimed to have been present at the scene with other participants but denied touching Ray's body [*Id.* at 134-36]. Marlow stated that Underwood claimed that he had no open wounds and could not have left his blood at the scene, conceding that there were "major inconsistencies" between Underwood's statements during the February 25 interview and the scientific evidence [*Id.*]. Marlow maintained that it would have been ineffective not to try to have the February 25 conversation covered under Rule 11 but admitted he had never asked the ADA to consider an interview with a defendant under Rule 11 [*Id.* at 142-43].

Following Marlow's testimony, the post-conviction hearing was continued to November 15, 2010. Underwood testified on that date [*Id*. at 162]. He stated that he had been wrongfully convicted, and that others were responsible for the murders [*Id*. at 163-170]. He stated he did not testify at trial because his family was threatened by the actual perpetrators of the crime [*Id*. at 171-72]. He offered no testimony relevant to his ineffective assistance of counsel claims.

Following the hearing, the trial court orally denied the writ of error *coram nobis*, the motion for DNA analysis, and the petition for post-conviction relief [*Id*. at 193-195]. On January 14, 2011, the post-conviction court entered a written order containing factual findings to support the denials [Doc. 30-25 p. 91-100].

On January 27, 2014, three years after the post-conviction court entered its order denying relief, Underwood moved to file an untimely appeal that was later accepted [Doc. 30-27]. On June 5, 2015, the Tennessee Court of Criminal Appeals affirmed the post-conviction court's denial of relief. *Underwood v. State*, No. M2014-00159-CCA-R3-PC, 2015 WL 3533718, at *2 (Tenn. Crim. App. June 5, 2015), *perm. app. denied* (Tenn. Sept. 17, 2015) ("*Underwood II*"). On September 17, 2015, the Tennessee Supreme Court denied Underwood's application for permission to appeal. *Id*.

On December 7, 2015, Underwood filed a pro se petition for federal habeas relief that this Court subsequently ordered Underwood to amend [Docs. 1 & 6]. Underwood filed his amended petition on or about February 16, 2016, raising the following grounds for relief, as paraphrased by the Court:

Claim 1:     Trial counsel, Robert Marlow, rendered ineffective assistance of counsel when he failed to (a) subpoena and present exculpatory witnesses, and (b) debunk and rebut the prosecutor's theory.

Claim 2:      Trial counsel, Robert Marlow, rendered ineffective assistance of counsel when he failed to (1) challenge the State's suppression of evidence, and (b) diligently investigate the State's *Brady* violation.

Claim 3:      Trial counsel, Robert Marlow, rendered ineffective assistance of counsel when he failed to (a) properly obtain crime scene evidence experts, and (b) utilize and develop exculpatory expert evidence regarding the blood splatter.

Claim 4:      Trial counsel, Robert Marlow, rendered ineffective assistance of counsel when he failed to properly obtain an expert to challenge the voluntariness and admissibility of Underwood's confessions.

Claim 5:      Trial counsel, Robert Marlow, rendered ineffective assistance of counsel when he failed to put on adequate supporting evidence and argue that Underwood was entitled to lesser-included offense instructions.

Claim 6:      Trial counsel, Robert Marlow, rendered ineffective assistance of counsel when he failed to properly argue that the evidence was insufficient to establish first-degree murder.

Claim 7:      Trial counsel, Robert Marlow, rendered ineffective assistance of counsel when he failed to put on adequate supporting evidence and argue that the admission of prior bad acts violated Underwood's due process rights.

Claim 8:      Trial counsel, Robert Marlow, rendered ineffective assistance of counsel when he failed to properly challenge the admissibility of Underwood's incriminating statements.

Claims 9-10:  The trial court erred in "dismissing" appointed counsel, Hershell Koger, instead of having him assist the counsel retained by Underwood's family.

Claims 11-12: Pre-trial counsel, Fannie Harris, rendered ineffective assistance of counsel when she failed to provide adequate protections to Underwood during his February 25, 2005, interview with the Assistant District Attorney.

Claim 13:     Trial counsel, Robert Marlow, rendered ineffective assistance of counsel when he failed to properly challenge the court's "disqualification" of Counsel Koger and the failure to appoint counsel.

Claims 14-15: The trial court erred in denying Underwood's request for a continuance.

Claims 16-17: The trial court erred in denying Underwood's request for funds to hire expert witnesses.

Thereafter, the Court ordered Respondent to file a response to the petition, and Respondent complied by filing an answer on September 12, 2016 [Doc. 27].

## II.
## LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Federal habeas relief may be granted under the "contrary to" clause where the state court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the state court applies the correct legal principle to the facts in an unreasonable manner. *See id.* at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry; it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable − a substantially higher threshold."); *Williams*, 529 U.S. at 410-11. When evaluating the evidence presented in state court, a federal habeas court presumes the

correctness of the state court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Federal habeas review is also limited by the doctrine of procedural default. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available state remedies, and the state court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 731-32, 735 n.1 (1991). A procedural default may be circumvented, allowing federal habeas review of the claim, where the prisoner can show cause for the default and actual resulting prejudice, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Id.* at 750; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90-91 (1977). "Cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules. *See id.* at 753. The "prejudice" sufficient to overcome a default must be actual, not merely possible. *See Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986) (citations omitted); *see also United States v. Frady*, 456 U.S. 152, 170 (1982) (holding prejudice showing requires petitioner to bear "the burden of showing, not merely that errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimension") (emphasis in original).

The ineffective assistance of counsel can serve as "cause" for a defaulted claim. *Coleman*, 501 U.S. at 753. For example, appellate counsel's failure to raise a meritorious claim of

ineffectiveness by trial counsel may render the claim procedurally defaulted. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) ("[I]n certain circumstances counsel's ineffectiveness in failing properly to preserve a claim for review in state court will suffice."). However, for an ineffective assistance of appellate counsel to serve as cause for a default, that claim must itself have been exhausted in the State courts before it is presented in federal habeas. *See id.* at 453 ("[A]n ineffective-assistance-of counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted.").

Generally, errors of post-conviction counsel cannot serve as "cause" to excuse a procedural default. *Coleman*, 501 U.S. at 752. An exception to this rule was established in *Martinez v. Ryan*, which held that the inadequate assistance of post-conviction counsel or the absence of such counsel may establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim under certain circumstances. *Martinez v. Ryan*, 566 U.S. 1,9 (2012). The Supreme Court has described the *Martinez* exception as containing the following requirements:

> [The exception] allow[s] a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez*, 566 U.S. at 13-14, 16-17).

Therefore, when considering an ineffective assistance of trial counsel claim under *Martinez*, a petitioner must show the ineffectiveness of post-conviction counsel and "the 'substantial' nature of his underlying [ineffective assistance of trial counsel] claims." *Woolbright v. Crews*, 791 F.3d 628, 637 (6th Cir. 2015). A substantial claim is one that "has some merit."

*Martinez*, 566 U.S. at 14.  Inversely, a claim is insubstantial if it "does not have any merit or. . . is wholly without factual support." *Id.* at 15-16.

A determination of whether an ineffective assistance of counsel claim is substantial requires a federal court to examine the claim under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a habeas petitioner to satisfy a conjunctive, two-prong test to warrant federal habeas corpus relief: (1) he must demonstrate constitutionally deficient performance by counsel, and (2) he must demonstrate actual prejudice as a result of such ineffective assistance.  *Strickland*, 466 U.S. 668, 687 (1984).  Deficiency is established when a petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Id.* at 687-88.  This Court's scrutiny is to be highly deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight."  *Id.* at 689.  In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment.  *Strickland*, 466 U.S. at 689.

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome.  *Strickland*, 466 U.S. at 687, 694.  However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment.  *Id.* at 691.

While the *Strickland* standard governs eventual review of the merits of an ineffective assistance of counsel claim, the question of whether an ineffective assistance of counsel claim is substantial is more akin to a preliminary review of the *Strickland* claim to determine whether a certificate of appealability should issue.  *Martinez*, 566 U.S. at 14-15.  Therefore, a court may

conclude that the petitioner has raised a substantial claim where the resolution of the claim would be "debatable amongst jurists of reason," or where the issues presented are "adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003). If the petitioner can successfully demonstrate cause and prejudice of post-conviction counsel under this preliminary review, the final step is for the district court to evaluate the underlying ineffective assistance of trial counsel claims on the merits. *Atkins v. Holloway*, 792 F.3d 654, 659–60 (6th Cir. 2015).

### III.
### CLAIMS 1-7 & 13

The claims asserted by Underwood in Claims 1-7 and 13 allege that he received the ineffective assistance of counsel. In his post-conviction petition and subsequent appeal, Underwood argued the ineffective assistance of trial counsel. However, he argued the claims on different grounds than those raised in Claims 1-7 and 13. These exact claims were never raised in State court, and therefore, they are defaulted. *See, e.g., Wong v. Money*, 142 F.3d 313, 321-22 (6th Cir. 1998) (finding ineffective assistance of counsel claim procedurally defaulted where petitioner's argument in state court relied on different grounds than argument on habeas appeal).

Underwood concedes that the ineffective assistance of counsel claims raised in Claims 1-7 and Claim 13 have never been presented to the State courts, and that there appears to be no avenue by which they may now be exhausted in State court. Accordingly, these federal claims are procedurally defaulted. *See Atkins*, 792 F.3d at 657 (holding where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him, the claim is technically exhausted, yet procedurally defaulted").

While Underwood stipulates that these claims have never been presented in State court, he argues that they may be reviewed by the exception created under *Martinez* due to the ineffective

assistance of post-conviction counsel, Russell Leonard, in raising the issues [*See* Doc. 9].

Respondent claims that Underwood cannot avail himself of the *Martinez* exception to demonstrate

"cause" for the default of these claims, arguing that it is well-settled that ineffective assistance of

counsel during post-conviction appeal does not constitute cause to overcome a procedural default.

*See Martinez*, 566 U.S. 1 at 16 (holding new exception "does not concern attorney errors in other

kinds of proceedings, including appeals from initial-review collateral proceedings").

     The Court agrees that the claims raised by Underwood in Claims 1-7, and to at least a

partial extent, Claim 13[7], have never been raised in any State-court proceeding. The Court finds,

however, that since Underwood is alleging that post-conviction counsel failed to present these

ineffective assistance claims during post-conviction proceedings (the first opportunity Underwood

had to present such claims), his claims should be analyzed pursuant to the *Martinez* exception. *See*

*Sutton v. Carpenter*, 745 F.3d 787, 795-96 (6th Cir. 2014) (holding *Martinez* exception is

applicable in Tennessee because defendants are directed to file ineffective assistance claims in

post-conviction rather than on direct appeal).

     In considering Underwood's claims, the Court notes that because the issue of whether post-

conviction counsel rendered ineffective assistance is "necessarily connected to the strength of the

argument that trial counsel's assistance was ineffective," it is, in this instance, "more efficient for

the reviewing court to consider in the first instance whether the alleged underlying ineffective

assistance of counsel was 'substantial' enough to satisfy the 'actual prejudice' prong of *Coleman*."

*Thorne v. Hollway*, No. 3:14-CV-0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014),

*aff'd sub nom. Thorne v. Lester*, 641 F. App'x 541 (6th Cir. 2016).

--------------------------------------------------------

   [7] Post-conviction counsel, through an amended post-conviction petition, raised an
ineffective assistance of trial counsel claim based Koger's motion to withdraw [Doc. 30-25 p. 59-
61].

## A. Claim 1

Underwood claims that trial counsel Marlow rendered ineffective assistance of counsel in failing to subpoena and present exculpatory witnesses to rebut the prosecutor's theory of the crime. Specifically, he maintains that counsel should have demonstrated that he had no motive to commit the murders while Greg Marlin and his accomplices did have such motives [*See* Doc. #9 p. 4-12]. He asserts that an individual named Dameon Rushmire had informed both initial counsel Fannie Harris and investigator Bobby Brown that Greg Marlin had admitted to him that he committed the murders, and that trial counsel should have called Rushmire, Brown, and members of the District Attorney's Office and Shelbyville Police Department as witnesses [*Id*. at 8].

The Court notes that no statement from Rushmire is in the record, and that Fannie Harris testified at the post-conviction hearing that she did not remember interviewing Dameon Rushmire [Doc. #30-26 p. 4-5]. Donna Smith, Underwood's mother, testified at the post-conviction hearing that she was present at an interview with Rushmire and Harris, and that she informed trial counsel Marlow on how to contact Rushmire [*Id*. at 31, 46]. She admitted, however, that her later attempts to locate Rushmire proved unsuccessful [*Id*. at 47-48]. Marlow testified at the hearing that he requested a tape of Harris' interview with Rushmire, but that it was never produced, and that he was never able to verify that such a tape existed [*Id*. at 113-14, 133]. He stated that both he and his investigator attempted to locate Rushmire but were unsuccessful in locating him or a member of his immediate family [*Id*. at 114]. Marlow additionally stated that Underwood refused to speak to him or his investigator about his involvement in the crime, or that of other potential suspects, including Greg Marlin [*Id*. at 115-16].

Upon review of the record, the Court finds that Underwood cannot establish deficiency by counsel for failing to produce additional witnesses, as it is apparent that counsel worked diligently

with the information he was provided, despite Underwood's reluctance to cooperate. On multiple occasions, trial counsel questioned witnesses regarding Marlin and OD, along with other presumably uninvestigated potential suspects, to raise doubt as to Underwood's participation in the actual murders [*See* Doc. 30-11 p. 49-50, 140-41; Doc. 30-12 p. 61-62, 67; Doc. 30-14 p. 43; Doc. 30-15 p. 46-48, 80-82].

Additionally, even if Rushmire, Marlin, and/or OD were located and subpoenaed for trial, Underwood's DNA and fingerprints were found in blood at the crime scene, and his DNA was found on the inside driver's side of the stolen vehicle [Doc. 30-13 p. 96]. Therefore, the presence of another individual at the scene would not have exonerated Underwood, and Underwood cannot demonstrate prejudice from counsel's failure to produce additional witnesses. Accordingly, no exception exists under *Martinez* to rescue this claim from procedural default, and it will be dismissed.

### B. Claim 2

Underwood next asserts that trial counsel, Robert Marlow, rendered ineffective assistance of counsel when he failed to (1) cross-examine officers from the Shelbyville Police Department and the ADA about what Greg Marlin received in exchange for his cooperation, and (2) move for a hearing regarding the State's failure to fulfill its duty to hand over all exculpatory evidence, including its deals with Greg Marlin [Doc. 9 p. 12-13].

There is no evidence of any cooperation by Marlin in this case, or that the State was in possession of exculpatory evidence, aside from Underwood's conclusory assertion of such. Further, there is no evidence that further investigation would have yielded such evidence. This allegation is wholly without factual support. Therefore, it is an insubstantial claim of ineffective assistance, and Underwood cannot rely on *Martinez* to overcome the default. *See Martinez*, 566

U.S. at 16 (holding procedural default need not be excused when the underlying claim is without merit or any factual support); *see also Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000) (finding that a conclusory statement is insufficient to raise an issue of ineffective assistance of counsel); *Hairston v. Barrett*, No. 16-1590, 2017 WL 10399395, at *2 (6th Cir. 2017) (noting conclusory assertions will not support ineffective assistance of counsel claim). This claim will be dismissed.

### C.    Claim 3

Underwood asserts that trial counsel rendered ineffective assistance of counsel in failing to obtain the exculpatory witness testimony of crime scene reconstructionist and blood spatter experts to prove the physical impossibility of State witnesses' testimony, as he would have been incapable of overpowering two victims without receiving substantial injuries himself [Doc. 9 p. 14-15].

The Court notes that trial counsel did request expert services in the trial court, and that the Supreme Court denied the appeal of the motion [Doc. 30-2 p. 48-51]. Moreover, as the Court has already noted, the presence of a second attacker, even if proved, would not have exculpated Underwood given the fingerprint and DNA evidence. In short, this allegation is wholly without factual support. Therefore, it is an insubstantial claim of ineffective assistance, and Underwood cannot rely on *Martinez* to rescue this claim from default. *See Martinez*, 566 U.S. at 16. This claim will be dismissed.

### D.    Claim 4

Underwood argues that trial counsel rendered ineffective assistance of counsel in failing to obtain an expert to challenge the voluntariness and admissibility of his confessions, as he was

wounded, medicated, and intoxicated at the time he gave his initial, coerced statement to the Shelbyville Police Department [Doc. 9 p. 17].

As an initial matter, the Court notes that counsel did move to suppress Underwood's November 10, 2004, statement to police on numerous grounds, including that the statement was involuntary, the product of coercion, given only after an involuntary waiver of Underwood's *Miranda* rights, and induced by guarantees of leniency and improper references to religion and morality [Doc. 30-2 p. 19]. The court denied the motion, determining that the totality of the circumstances demonstrates that Underwood "voluntarily and knowingly waived his right against self-incrimination and voluntarily gave the statements given on the 11-10-04 videotape" [*Id*. at 29]. Further, the matter was again raised in the motion for a new trial [*Id*. at 124-25].

Moreover, there is no evidence before the Court to suggest that Underwood was intoxicated and severely wounded, and counsel did not perform deficiently, nor did prejudice ensue, from counsel's failure to raise a claim wholly without factual support. Therefore, this is an insubstantial claim of ineffective assistance, and Underwood cannot rely on *Martinez* to overcome the default. *See Martinez*, 566 U.S. at 16. This claim will be dismissed.

### E.    Claim 5

Underwood claims that trial counsel rendered ineffective assistance of counsel when he failed to put on adequate supporting evidence to effectively argue that Underwood was entitled to lesser-included offense instructions regarding facilitation [Doc. 9 p. 22].

Under Tennessee law, the offense of facilitation of felony murder requires proof that:

1. a killing was committed in the perpetration of one of the felonies specified by Tenn. Code Ann. § 39–13–202(a)(2) or (3);
2. the defendant knew that another person intended to commit the underlying felony, but he or she did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense; and

3. the defendant furnished substantial assistance to that person in the commission of the felony; and

4. the defendant furnished such assistance knowingly.

*State v. Ely,* 48 S.W. 3d 710, 719-720 (Tenn. 2001) (citing Tenn. Code Ann. §§ 39–13–202, 39–11–403).

Underwood's jury was instructed on the lesser-included offenses of second-degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide [Doc. 30-2 p. 96-105]. While the jury was not instructed on facilitation to commit murder, Marlow requested the court to consider such an instruction, and the trial court found no evidence had been offered to support such an instruction [Doc. 30-15 p. 146-147]. Specifically, the court noted that in his first statement, Underwood did not mention another participant [*Id.* at 147]. In the second statement, Underwood stated that he did not witness any of the crimes; he was merely told about it [*Id.*]. Therefore, an instruction that Underwood was responsible for facilitating the offense is not supported in the record, and counsel did not perform ineffectively in failing to argue it. Accordingly, this claim is insubstantial and Underwood cannot invoke the *Martinez* exception to overcome its default. *See Martinez*, 566 U.S. at 16. It will be dismissed.

## F.     Claim 6

Underwood asserts that trial counsel rendered ineffective assistance of counsel when he failed to properly argue that the evidence was insufficient to establish first-degree murder, as the evidence of Greg Marlin's guilt that was introduced at trial would have supported an instruction concerning third-party guilt [Doc. 9 p. 19].

In *Holmes v. South Carolina*, the Supreme Court approved of rules excluding evidence offered by criminal defendants to show third-party guilt "where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote." *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006). As the Court has previously noted, even if Marlin

were a participant in these murders, Underwood would not be absolved of guilt; his fingerprints and DNA were found at the crime scene and in the vehicle stolen from the scene. Nonetheless, despite the fact of Underwood's undisputable involvement in the crimes, trial counsel repeatedly questioned witnesses about the victims' drug use and the fact that known drug dealers lived near where the truck was found to cast doubt on Underwood's role as the murderer [*See, e.g.,* Doc. 30-12 p. 61-64]. Additionally, at closing, Marlow argued Underwood was present at the time of the crimes, but that the absence of blood on his clothes or murder weapon should give doubt to his involvement in the actual murder [Doc. 30-16 p. 70-75]. Therefore, the Court determines that Underwood has not demonstrated that counsel was deficient, or that he was prejudiced, by trial counsel's failure to introduce an instruction regarding third-party guilt. He cannot demonstrate ineffectiveness by counsel, and accordingly, and he cannot invoke the *Martinez* exception to overcome the procedural default of this claim. *See Martinez*, 566 U.S. at 16. This claim will be dismissed.

### G.     Claim 7

Underwood maintains that trial counsel rendered ineffective assistance of counsel when he failed to put on adequate supporting evidence and argue that the admission of his prior arrests and allegations of his crack dealing were irrelevant and highly prejudicial [Doc. 9 p. 23]. Underwood does not cite to any portion of the transcript indicating that any prior bad acts were introduced, and if any such references were introduced, it was during his voluntary statements that were played as evidence to the jury. Accordingly, this is a conclusory argument wholly without factual support, and *Martinez* cannot vitiate the procedural default of this claim. *See Martinez*, 566 U.S. at 16. This claim is dismissed.

### H.     Claim 13

Underwood contends that trial counsel rendered ineffective assistance of counsel when he failed to object to the trial court's "disqualification" of Koger and request the appointment of co-counsel [Doc. 9 p. 32].

The Court notes that post-conviction counsel, through an amended post-conviction petition, raised an ineffective assistance of trial counsel claim based on Koger's motion to withdraw. Therefore, to the extent that this claim has been adjudicated on its merits, *Martinez* is inapplicable. *See Abdur'Rahman v. Carpenter*, 805 F.3d 710, 715 (6th Cir. 2015) (noting *Martinez* inapplicable to claim that was not defaulted). To the extent the claim was not raised, the Court finds that Underwood has not demonstrated any deficient performance by counsel or resulting prejudice, as his argument that he would have prevailed at trial if he had two attorneys is speculative and insufficient to meet the *Martinez* test of substantiality. This claim is dismissed.

### IV.
### CLAIM 8

In his eighth claim of error, Underwood claims that he was denied the effective assistance of counsel when his trial counsel, Robert Marlow, failed to properly challenge the admissibility of Underwood's incriminating statements.

On post-conviction appeal, Underwood claimed that his trial counsel rendered ineffective assistance for failing to file a motion to suppress his incriminating statements during his February 25, 2005, interview [Doc. 30-27 p. 20]. This claim was not raised in Underwood's petition for post-conviction relief at the trial level, and therefore, was not addressed by the trial court in its order dismissing the petition. It was, however, raised on appeal to the Tennessee Court of Criminal

Appeals, which found it to be waived for failure to raise the issue in during post-conviction initial proceedings. *Underwood II*, 2015 WL 3533718, at *7.

Where a State court declines to reach the merits of a petitioner's claims due to application of "an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Shahideh v. McKee*, 488 F. App'x 963, 965 (6th Cir. 2012). In Tennessee, a ground for relief is waived if it could have been, but was not, raised in a prior proceeding. Tenn. Code Ann. § 40-30-106(g). Tennessee's waiver rule is a regularly followed State procedural rule that supplies an independent and adequate State-law ground that bars habeas review absent a demonstration of cause and prejudice. *Hutchinson v. Bell*, 303 F.3d 720, 738-39 (6th Cir. 2002) (noting Tennessee's waiver provision provides independent and adequate state law ground that will generally bar federal habeas relief) (citing *Cone v. Bell*, 243 F.3d 961, 969-70 (6th Cir. 2001), *rev'd and remanded on other grounds*, 535 U.S. 685 (2002) (holding Tennessee's "waiver rule" is regularly applied)). Accordingly, Underwood has defaulted this claim.

Underwood attempts to establish cause for his default by citing post-conviction counsel's alleged ineffectiveness in failing to raise and argue the claim that Marlow was ineffective in challenging the admissibility of his statement to law enforcement on February 25, 2005, as the statement was the direct result of pretrial counsel Fannie Harris' erroneous legal advice [Doc. 9 p. 25]. He also alleges post-conviction counsel Leonard was ineffective when he failed to put Underwood on the stand during the post-conviction hearing and question him about what he believed the nature of the February 25 interview to be [*Id*.].

The Court finds that Underwood cannot establish that counsel rendered ineffective assistance in failing to properly challenge the statement he gave during the February 25 interview, as Marlow did challenge that interview [Doc. 30-14 p. 131-39]. Moreover, the interview Underwood seeks to challenge was a second interview; he had already confessed to the crimes in the first interview following a waiver of his rights [*See* Doc. 30-1 p. 83]. Therefore, even if the second interview had been excluded, Underwood would still have implicated himself in the murders, and he cannot demonstrate that he was prejudiced because his February 25 interview was not excluded at trial.

Moreover, to the extent that he raises this as an independent claim of post-conviction counsel based on Leonard's failure to put Underwood on the stand during the post-conviction hearing, the Court notes that there is no constitutional right to an attorney in State post-conviction proceedings, and therefore, to the extent this is an independent claim, it is not cognizable. *See, e.g.,* 28 U.S.C. § 2254(i) (stating claims alleging ineffective assistance of collateral review counsel not cognizable); *Martinez,* 566 U.S. at 9; *Coleman,* 501 U.S. at 752 ("There is no constitutional right to an attorney in state post-conviction proceedings."). This claim is dismissed.

## V.
## CLAIMS 9 & 10

In Claims 9 and 10, Underwood claims that the trial court erred in "dismissing" appointed counsel, Hershell Koger, instead of having him assist counsel retained by Underwood's family. This issue was raised on direct appeal, where the Tennessee Court of Criminal Appeals noted the following:

> The record shows that the defendant had several different attorneys during the pretrial period. The defendant's family first funded private counsel for the defendant who then withdrew from representation. The court then appointed the public defender's office to represent the defendant. After a conflict of interests was discovered, the public defender's office withdrew from the case, and the court

> appointed Hershell D. Koger on July 18, 2005, to represent the defendant. Mr.
> Koger participated in a significant amount of the pre-trial process. On February 24,
> 2006, Robert Marlow, who ultimately served as defendant's trial and appellate
> counsel, filed a notice of appearance.
>
> Mr. Marlow stated to the trial court that he had filed a notice of appearance "to
> notify the Court and the parties [that he had] been retained and [was] going to take
> part in anything and represent [the defendant] in any way." Mr. Marlow stated that,
> "Both Mr. Underwood and his mother and the other family members know by doing
> so that may very well necessitate the disqualification of Mr. Koger."

*Underwood I*, 2008 WL 5169573, at *15–16. During pre-trial proceedings, Underwood stated that

he had no objection to replacing Koger with Marlow as attorney of record [Doc. 30-6 p. 46].

Marlow stated that Underwood's family had retained his services, and that if Koger were allowed

to withdraw, he was "willing to take fully responsibility for the representation" going forward

without anticipating the need to request a continuance [*Id*. at 48-49]. Koger's subsequent motion

to withdraw was granted, with the trial court noting that "[Underwood] is not entitled to both

retained and appointed counsel" [Doc. 30-2 p. 30-31].

While Underwood appealed the substitution of Koger, he waived the issue by failing to

raise the issue until his motion for a new trial. *Underwood I*, 2008 WL 5169573, at *15-17.

Moreover, the appellate court noted, Underwood stated he did not object to Marlow replacing

Koger as counsel, which contradicted his view on appeal. *Id.*

Here, the State court declined to reach the merits of Underwood's claim due to application

of an independent and adequate State procedural rule, barring the claim on habeas review unless

Underwood can demonstrate cause and prejudice, or that failure to consider the claims will result

in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Hutchinson*, 303 F.3d at 738-

39. The Court finds that Underwood has argued no exception that would vitiate the bar, and this

claim is dismissed.

# VI.
## CLAIMS 11 & 12

In Claims 11 and 12, Underwood claims he received the ineffective assistance of pretrial counsel, Fannie Harris, when she failed to provide "adequate protections" to him during his February 25, 2005, interview with the ADA.

On post-conviction appeal, the Tennessee Court of Criminal Appeals found Harris did not render ineffective assistance, noting (1) the February 25 interview was not conducted as part of plea negotiations; (2) any alleged error was trial counsel's failure to object to the statement at trial; and (3) even assuming deficient performance, Underwood could not show he was prejudiced by the introduction of the statements from that interview. *Underwood II*, 2015 WL 3533718, at *7.

At Underwood's evidentiary hearing, Harris testified that although she did not remember seeking formal protection for Underwood prior to his making a statement to the district attorney, she had no reason to believe he would make incriminating statements, or else she would not have agreed to the interview. *Id*. at *4. Moreover, the transcript from the February 2005 interview was never admitted during either appeal, and Underwood's November 10, 2004, interview was admitted, in which he discussed his participation in the murders. Therefore, as the State court found, Underwood's credibility was unlikely to have been "significantly affected by the introduction of his February 25 statements." *Id.* at *7. Accordingly, Underwood has not demonstrated that the rejection of this claim was contrary to or involved an unreasonable application of *Strickland* and its progeny, nor has he demonstrated that it was based upon an unreasonable determination of facts in light of the evidence presented. These claims are dismissed.

## VII.
## CLAIMS 14 & 15

Underwood claims that the trial court erred in denying his request for a continuance of trial. In discussing this claim on direct appeal, the Tennessee Court of Criminal Appeals determined the trial court had not abused its discretion in denying Underwood's request, as Underwood had failed to offer evidence that the denial of a continuance prejudiced his defense. *Underwood I*, 2008 WL 5169573, at \*20-21. The State court found:

> [T]he defendant and his counsel had ample means and opportunity to investigate and develop mitigating evidence. When defense counsel noted his appearance to the court, he assured the trial court that he was familiar with the case. Although defense counsel served as defendant's attorney for less than two months, the defendant had been represented by Mr. Koger for more than seven months prior to that. The record shows that Mr. Koger served as an aggressive advocate for the defendant, filing several motions regarding expert assistance, discovery, and continuance of the trial date. Further, we note that the trial court had ordered a continuance of the defendant's trial date on four separate occasions. The defendant did not suffer prejudice as a result of the trial court's denial of a continuance, and the trial court did not err.

*Id*.

The denial of a continuance rises to the level of a constitutional violation only where the circumstances denying the continuance are so arbitrary as to violate due process, and the denial results in actual prejudice to the defense. *See Burton v. Renico*, 391 F.3d 764, 722 (6th Cir. 2004) (citing *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)). While Underwood argues that he was denied an adequate opportunity to gather mitigating evidence due to the trial court's denial of a continuance, he offers no evidence that the trial court's denial deprived him of his constitutional rights under the above-cited standard. Accordingly, the Court finds that the decision rejecting this claim was not contrary to, nor did it involve an unreasonable application of, clearly established

Supreme Court law, nor was it based on an unreasonable determination of facts in light of the evidence presented. These claims are dismissed.

## VIII.
## CLAIMS 16 & 17

In his final claims of error, Underwood alleges that the trial court erred in denying his *ex parte* motions for a mitigation expert, a forensic neuropsychologist, and a DNA expert [*See* Doc. 30-3 p. 6-10; Doc. 30-4 p. 3-15; Doc. 30-5 p. 9-35].

In rejecting this claim on direct appeal, the Tennessee Court of Criminal Appeals noted the trial court had previously granted Underwood $5,000 with which to hire an investigator, and that the *ex parte* motion for a mitigation expert requested same private investigator. *Underwood I*, 2008 WL 5169573, at *17. The appellate court also noted that in denying the motion for forensic neuropsychologist, the trial court found that Underwood "was subject to in-patient psychiatric treatment services. . . Those records are readily available, and the treating physicians may be subpoenaed to discuss [Underwood]'s mental issues." *Id*. The Court of Criminal Appeals stated that in denying DNA services, the trial court found that no particularized need for the services was shown. *Id*. at *18. Noting that Underwood had twice been granted funding for the employment of investigative services and had been granted the services of an expert in fingerprint analysis, the Tennessee Court of Criminal Appeals found that Underwood's opportunity to present a defense was not diminished, nor was he denied a fair trial, by the denial of these other expert services. *Id*. at *19-20.

In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held that an indigent defendant is entitled to expert assistance under certain circumstances. *Id*. at 74. *Ake* was concerned that defendants not be deprived of such a "basic tool" of defense, such that its deprivation results in a fundamentally unfair trial. *Id*. at 83. The Sixth Circuit has "interpreted *Ake* as allowing psychiatric

assistance during the sentencing phase if 1) the defendant's sanity was a significant factor at trial, or 2) the state presents at sentencing psychiatric evidence of future dangerousness." *Smith v. Mitchell*, 348 F.3d 177, 207 (6th Cir. 2003).

Federal habeas review of a trial court's denial of expert services "must focus on the showing made as to the necessity of the expert, the type of expert required, how the expert would be useful, and also that a reasonable probability exists that denial of expert assistance would result in a fundamentally unfair trial." *Thacker v. Rees*, 841 F.2d 1127, 1988 WL 19179, at *8. (6th Cir. 1988); *see also Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993) (noting *Ake* stands for proposition that criminal trials are fundamentally unfair "if a state proceeds against an indigent defendant without marking certain that he has access to the raw materials integral to building a defense").

The record in this case supports the conclusion that Underwood was twice granted funding for investigative services, that he had received a forensic evaluation to evaluate his competency to stand trial and his mental condition at the time of the offense, and that he failed to present evidence to disprove that his defense counsel was incapable of reviewing mitigating evidence and social history himself at the time the motions for continuance were filed. Therefore, he has not established that the trial court violated his constitutional rights when it denied his request for additional funding for mitigation experts. Accordingly, the Court finds that the decision rejecting this claim was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent[8], nor was it based on an unreasonable determination of facts in light of the evidence presented. These claims are dismissed.

---

[8]    The Court otherwise notes that the Supreme Court has not explicitly extended *Ake* to non-psychiatric experts. *See, e.g., McGowan v. MacLaren*, No. 1:13-CV-904, 2017 WL 3175767, at *12 (W.D. Mich. Mar. 31, 2017), *report and recommendation adopted*, No. 1:13-CV-904, 2017 WL 3172840 (W.D. Mich. July 26, 2017), *certificate of appealability denied sub nom. McGowan v. Winn*, No. 17-2000, 2018 WL 1414902 (6th Cir. Mar. 21, 2018).

## IX.
## CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added). Applying this standard, the Court concludes that a COA should be denied in this case.

## X.
## CONCLUSION

For the reasons set forth above, Jason Underwood has failed to demonstrate an entitlement to federal habeas relief. Therefore, it is hereby **ORDERED** that his petition for a writ of habeas corpus is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**. It is **FURTHER ORDERED** that a certificate of appealability from this decision is **DENIED**. A separate judgment order will issue.

**IT IS SO ORDERED**.


　　　　　*/s/ Harry S. Mattice, Jr.*
　　　　　HARRY S. MATTICE, JR.
　　　　　UNITED STATES DISTRICT JUDGE